**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case No. 5:24-CV-1023** |
| | § | |
| **KDHK, INC.,** *doing business as* | § | |
| *Allegiance Environmental Services,* | § | |
| **KENNETH FLORES, IRMA E. FLORES,** | § | |
| **and CHRISTOPHER A. FLORES,** | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff's Motion for Summary Judgment, (*ECF No. 27*). Defendant

Christoper A. Flores filed a Response, (*ECF No. 35*), to which Plaintiff filed a Reply, (*ECF No.

36*). Upon due consideration of the briefings, the summary judgment evidence presented, and the

applicable law, Plaintiff's Motion for Summary Judgment, (*ECF No. 27*), will be **GRANTED-**

**IN-PART AS TO LIABILITY AND DENIED-IN-PART AS TO DAMAGES.**

## I.    FACTUAL BACKGROUND

This action arises out of a conspiracy to unlawfully obtain two government contracts for

housekeeping services at U.S. Army medical centers. *See*, *generally*, *ECF No. 1*. The two con-

tracts at issue are referred to in the briefings as the Madigan Army Medical Center Contract

("MAMC Contract") and the Tripler Army Medical Center Contract ("TAMC Contract"). *Id*. at 5.

### A.    The MAMC Contract

Per the Complaint, on October 15, 2014, the U.S. Army Medical Command at Fort Sam Houston, Texas, awarded the MAMC Contract to HHI Services Inc. ("HHI"), a non-profit entity controlled by the Flores family. *ECF No. 1* at 5. The remaining defendant in this action, Defendant Christopher A. Flores ("Defendant Chris Flores"), served as HHI's Vice President. *Id*. at 3.

On October 29, 2014, Madigan Army Medical Center employee Karisa Kelly ("Kelly") became the Contracting Officer's Representative ("COR") [1] on the MAMC Contract. *Id*. at 6. Around December 2014 or January 2015, Defendant Kenneth Flores ("Kenneth Flores") and Kelly entered into a romantic relationship. *Id*. at 6.

As alleged, beginning no later than January 2018, Kelly began to work surreptitiously with Kenneth Flores and other members of the Flores family to assist HHI with drafting and preparing a Request for Equitable Adjustment ("REA") [2] on the MAMC Contract. *Id.* at 7. At Kenneth Flores's request and direction, Kelly devised a strategy for HHI to persuade the relevant government personnel to award an additional $2.7 million to HHI by way of the REA. *Id*. at 7.

On February 16, 2018, Kelly sent an email from her Army email account to her personal email account, attaching draft wording for the justification for the REA. *Id*. at 7. Kelly prepared the draft justification language while on the phone with Kenneth Flores. *Id*. at 7. Kelly's draft

---

[1] The COR is a military or civilian employee of Plaintiff authorized by the contracting officer to perform specific technical and administrative functions. *Id*. at 6.

[2] An REA is a request from a contractor to a contracting officer for an equitable change to the contract price based on a change to the contract requirements. If the contracting officer agrees with the requested adjustment, the contract will be modified. *Id.* at 7.

2

proposed an additional $179,000 per month to go toward direct labor costs and hiring additional housekeepers and employees due to the implementation of MHS Genesis.[3] *Id*. at 7.

The U.S. Army granted the REA in September 2018 and in total—between October 10, 2018, and August 5, 2019—Plaintiff remitted $2,735,550.37 to HHI under the MAMC Contract REA. *Id*. at 10. Later, Plaintiff learned HHI did not actually hire additional housekeepers and employees due to the implementation of MHS Genesis. *Id*. at 8. These were fictitious labor costs and the money requested instead represented additional, illicit profits for HHI. *Id*. at 8.

**B.    The TAMC Contract**

On August 1, 2018, the U.S. Army Health Contracting Agency at Fort Sam Houston, Texas, awarded the TAMC Contract to Defendant KDHK Inc., doing business as Allegiance Environmental Services ("AES"), another entity controlled by the Flores family. *ECF No. 1* at 3.

John Jordan "Chip" Mathes ("Mathes") was the Chairperson of the Source Selection Evaluation Board[4] for the TAMC Contract, which met in San Antonio from on or around February 26, 2018, through on or around March 30, 2018. *Id*. at 13. At the time, Mathes was a U.S. Army employee who served as the Regional Hospital Housekeeping Officer overseeing healthcare housekeeping and environmental services at Army medical facilities in the Pacific. *Id*. at 13. Kelly, Kenneth Flores' romantic partner, who was still a U.S. Army employee in early 2018, was also a member of the Source Selection Evaluation Board. *Id*. at 13.

At some point, Kenneth Flores and Mathes entered into an agreement whereby Mathes would use his position as a government employee to help AES obtain the TAMC Contract. *Id*. at 13. Mathes provided Kenneth Flores with information to assist AES in unlawfully obtaining the

---

[3] MHS Genesis is the Military Health System's new electronic health records system, which was first implemented at MAMC and other military medical facilities in the Pacific Northwest on or about February 7, 2017. *Id*. at 8.
[4] A Source Selection Evaluation Board is a group of military and/or civil personnel who are responsible for evaluating proposals submitted in response to a solicitation for a Federal procurement contract. *Id*. at 13.

TAMC Contract. *Id*. at 13. For example, Mathes provided Kenneth Flores multiple versions of the Independent Government Cost Estimate ("IGCE")[5] for the TAMC Contract. *Id*. at 13.

Mathes did not provide the IGCE to any other companies submitting bids for the TAMC Contract. *Id*. at 14. Kenneth Flores received the IGCE knowing it was not provided to other competitors. *Id*. at 14. He transmitted it to his brother, Defendant Chris Flores, for use in preparing AES's bid to obtain the TAMC Contract. *Id*. at 14.

AES used the non-public information provided by Mathes to tailor its proposal to meet the criteria that the Source Selection Evaluation Board would use when it convened to determine the qualified bidders for the TAMC Contract. *Id*. at 14. AES also used the IGCE to propose nearly the highest possible price while remaining within Plaintiff's internal budget. *Id*. at 14. AES's proposed price was within 0.3% of the updated IGCE provided by Mathes to Kenneth Flores in February 2018. *Id*. at 14. AES's proposed contract price was the highest of any bidder for the TAMC Contract. *Id*. at 14.

Kenneth Flores and Kelly also entered into an agreement whereby Kelly would use her position as a government employee to help AES obtain the TAMC Contract. *Id*. at 15. Kenneth Flores told Kelly he would take care of her if AES won the TAMC Contract. *Id*. at 15.

Both Mathes and Kelly ultimately used their influence on the Source Selection Evaluation Board to steer the TAMC Contract to AES. *Id*. at 15. In total, Mathes and Kelly disqualified nine other offeror's proposals as "unacceptable" and recommended that only AES be deemed

---

[5] The IGCE is Plaintiff's own estimated cost or price that a contractor may incur in providing services and products to achieve Plaintiff's objectives. *Id*. at 13. The IGCE, including any supporting work sheets, is confidential and commonly labeled as "Source Selection Sensitive" or "Procurement Sensitive." *Id*. at 14. The IGCE and the information it contains may not be provided to a potential contractor before the potential contractor prepares a proposal or while it is preparing one. *Id*. at 14. Improperly disclosing this information to an offeror would give that offeror an unfair competitive advantage. *Id*. at 14.

eligible. *Id*. at 15. They made this recommendation as part of their agreement and scheme with Kenneth Flores to ensure AES won the TAMC Contract. *Id*. at 15.

AES submitted its first claim for payment under the TAMC contract on or about September 14, 2018. *Id*. at 16. Between on or around October 5, 2018, and on or around April 6, 2022, Plaintiff remitted $48,174,492.51 to AES under the TAMC Contract. *Id*. at 16.

### C.    Defendant Christopher Flores' Plea Agreement

In August 2023, Defendants Chris Flores, Kenneth Flores, and Irma Flores each pleaded guilty to criminal offenses arising out of the underlying events alleged in the Complaint. *ECF No. 1* at 21–23. As relevant here, Chris Flores pleaded guilty to paying an unlawful gratuity to a public official in violation of 18 U.S.C. § 201(c)(1)(A). *Id*. at 23

In his Written Plea Agreement, Chris Flores admitted that he, "individually and aiding and abetting Kenneth Flores," gave, offered, and promised things of value to Kelly and Mathes "for or because of" official acts they took on behalf of companies owned or controlled by the Flores family. *Id*. at 23. He further admitted those official acts included "providing [] confidential government information and source selection information to [Kenneth] Flores and making recommendations favorable to HHI and AES with respect to the TAMC contract and the MAMC [Contract]." *Id*. at 23. Chris Flores also admitted the payments made to Kelly and Mathes "originated with HHI and AES but were funneled . . . through Alliance Supply," a separate company he owned. *Id*. at 19 and 23. From November 15, 2018, until June 25, 2020, Alliance paid Mathes' company C & S Consulting $216,710.46. *Id*. at 23. From February 21, 2019, until July 17, 2020, Alliance paid Kelly's company Waysepappy Consulting $57,096.50. *Id*. at 23.

Defendant Chris Flores agreed to "make full restitution in this case in the amount of $3,700,000, jointly and severally, with any other Defendants." *ECF No. 27-1* at 16–17. In their

briefings, Plaintiff and Defendant Chris Flores state the $3,700,000 in restitution from the criminal matter has been satisfied. *ECF No. 35* at 34; *ECF No. 36* at 8.

### D.    Procedural History

Following his guilty plea, Plaintiff filed this civil action for violations of the False Claims Act ("FCA") against Defendants on September 11, 2024. *ECF No. 1*. Later, on August 11, 2025, Plaintiff filed its Joint Stipulation of Dismissal as to Defendants KDHK Inc., Kenneth Flores, and Irma Flores. *ECF No. 26*. Defendant Chris Flores is the remaining defendant in this action.

In the instant Motion, Plaintiff moves for summary judgment only as to its cause of action pursuant to 31 U.S.C. § 3729(a)(1)(A). *ECF No. 27* at 2–3.  Plaintiff identifies forty-six (46) fraudulent invoices, totaling $215,218.27, and seeks treble damages and civil penalties based on this narrower claim. *Id*. at 3. The Motion requests $645,654.81 in treble damages and $658,168 in civil penalties, for a total requested award of $1,303,822.81. *Id*. at 3.

On March 17, 2026, the Court provided the parties with an opportunity, pursuant to Federal Rule of Civil Procedure 56(e)(1), to properly support the record. *ECF No. 37*. Both Plaintiff and Defendant Chris Flores filed Responses, (*ECF No. 39, 40*).

### II.    LEGAL STANDARD

Summary judgment is appropriate if the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Rodriguez v. Pacificare, Inc.*, 980 F.2d 1014, 1019 (5th Cir. 1993).[6] "A fact is material only if its resolution would affect the outcome of the action." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). A genuine dispute for trial exists if the record taken as a whole could lead a reasonable

---

[6] Although 2010 amendments replaced "issue" with "dispute," the summary judgment standard "remains unchanged." Fed. R. Civ. P. 56 advisory committee notes (2010 amend.).

trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010). Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of informing the court of the basis for the motion and of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact or the appropriateness of judgment as a matter of law." *Celotex,* 477 U.S. at 323; *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006). The movant is not required to negate the elements of the nonmovant's case but may satisfy its summary judgment burden by demonstrating the absence of facts supporting specific elements of the nonmovant's cause(s) of action. *Little v. Liquid Air Corp.*, 37 F. 3d 1069, 1075, 1076 n. 16 (5th Cir. 1994). To satisfy this burden, the moving party must provide affidavits or identify any portion of the pleadings, discovery or admissions that demonstrate the absence of a triable dispute of material fact. *Celotex*, 477 U.S. at 323; *Rodriguez*, 980 F.2d at 1019. "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014).

If the movant carries its initial burden, the burden shifts to the nonmovant to present competent summary judgment evidence showing the existence of a genuine dispute of material fact. *Matsushita*, 475 U.S. at 586–87; *see also* Fed. R. Civ. P. 56(a). Upon the shifting burden, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003). The party opposing summary judgment is required to identify specific evi-

dence in the record and to articulate the precise manner in which this evidence raises a genuine dispute of material fact. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994)). Further, should the nonmoving party fail "to address or respond to a fact raised by the moving party and supported by evidence, then the court may consider the fact as undisputed" and "[s]uch undisputed facts may form the basis for a summary judgment." *Broadcast Music*, *Inc. v. Bentley*, SA-16-CV-394, 2017 WL 782932, at *2 (W.D. Tex. Feb. 28, 2017).

In determining the merits of a motion for summary judgment, a court has no duty to search the record for material fact issues or to find a party's ill-cited evidence. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012); *Ragas*, 136 F.3d at 458. In addition, a court may not make credibility determinations or weigh the evidence and must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citations omitted).

## III.    DISCUSSION

As a threshold matter, the Court notes Defendant Chris Flores does not clearly dispute liability under the False Claims Act ("FCA") in his Response to Plaintiff's Motion for Summary Judgment. *See ECF No.* 35. Instead, he limits his opposition to whether Plaintiff has established the requisite causal connection between the fraudulent conduct and the damages it seeks. *ECF No. 35* at 1.[7] He expressly states he "opposes [Plaintiff's] Motion for Summary Judgment ***solely*** as to Plaintiff's requested damages and penalties" and claims "liability may be left for Plaintiff to

---

[7] Flores distills his arguments in opposition as follows: the Court should deny Plaintiff's Motion because "the [G]overnment has not traced each invoice to a specific corrupt payment, and applying forty-six (46) separate penalties to this conduct is grossly disproportionate." *ECF No. 35* at 2, 5.

prove at trial or otherwise, but damages cannot be resolved on the present record." *Id.* (emphasis added). This, however, minimizes his summary judgment burden.

In opposing summary judgment, Chris Flores' burden is not only to "identify specific evidence in the record," but also to "articulate the precise manner in which that evidence supports [his] position." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (internal citations omitted). In his Response, Flores does neither. He merely recounts facts that have no obvious legal significance and fails to explain why they support his arguments. For example, he adopts a conclusory approach, asserting Plaintiff "has not met its burden" because "the entire record, together with all discovery and proceedings in the criminal case, establishes that damages—if any—must be determined at an evidentiary hearing." *ECF No. 35* at 6–7.

The Court affords liberal construction to Chris Flores' filings because he proceeds *pro se*. *See Haines v. Kerner,* 404 U.S. 519, 520–21 (1972) (per curiam). Even so, the Court notes *pro se* litigants are still required to "identify specific evidence in the record" supporting the motion for summary judgment and "articulate the precise manner in which that evidence supports [those] claim[s]." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir. 1994)).

### A.    Causes of Action for Violation of the False Claims Act

The FCA imposes liability on any person who: (A) knowingly submits or causes to be submitted a false claim for payment of government funds, (B) knowingly makes or causes to be made a false record or statement material to a false claim, or (C) conspires to commit any such violation. 31 U.S.C. § 3729(a)(1)(A)–(C). The FCA also imposes liability on any person who knowingly makes or causes to be made a false record or statement material to an obligation to transmit money to Plaintiff or knowingly conceals an obligation to transmit money to Plaintiff

9

(reverse FCA cause of action). *Id.* at § 3729(a)(1)(G). The FCA is enforceable through litigation brought by Plaintiff itself, and civil *qui tam* actions filed by private parties in the name of Plaintiff. *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 653 (2015) (internal quotations omitted).

Liability under the FCA requires: "(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused Plaintiff to pay out money or to forfeit moneys due . . . " *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (quoting *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017)). Thus, a "false claim" in the FCA context consists of a demand for money that induces Plaintiff to disburse funds or otherwise suffer immediate financial detriment. *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 385 (5th Cir. 2014), *abrogated by Wisconsin Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498 (2025).

The Court begins its analysis by determining whether the summary judgment record establishes liability under the FCA by analyzing each element of Plaintiff's cause of action.

### 1.    Plaintiff's FCA Cause of Action

In the instant Motion, Plaintiff moves for summary judgment only as to its cause of action pursuant to 31 U.S.C. § 3729(a)(1)(A). *ECF No. 27* at 2–3. Plaintiff contends the forty-six (46) invoices Defendant Chris Flores submitted on behalf of Alliance Supply to HHI and AES falsely represented charges for cleaning supplies when, in fact, they funded unlawful gratuity payments to Kelly and Mathes. *ECF No. 27*. As stated above, Defendant Chris Flores, for his part, states he opposes summary judgment solely as to damages and penalties. *ECF 35* at 1. Notwithstanding Defendant Chris Flores's limited opposition, to prevail on its § 3729(a)(1)(A)

claim at the summary judgment stage, Plaintiff is still required to establish each element of its FCA claim. The Court concludes that it has and discusses each element in turn.

### a.    False Statements or Fraudulent Course of Conduct

Plaintiff contends the forty-six (46) Alliance Supply invoices show false or fraudulent claims because they purported to bill HHI and AES for cleaning supplies while actually funding gratuity payments to Kelly and Mathes. *ECF No. 27* at 10–11. The Court agrees.

The presentment of a false or fraudulent claim for payment is the "*sine qua non*" of liability under § 3729(a)(1)(A). *U.S. ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 188 (5th Cir. 2009). Claims may be factually false or legally false. *U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.,* 133 F.4th 395, 403 (5th Cir. 2025). A claim is factually false when the information submitted for reimbursement inaccurately describes the goods or services for which payment is sought. *U.S. ex rel. Ruscher v. Omnicare, Inc.,* 663 F. App'x 368, 373 (5th Cir. 2016); *Waldmann v. Fulp,* 259 F. Supp. 3d 579, 590 (S.D. Tex. 2017).

Here, the summary judgment record establishes factual falsity. In his Written Plea Agreement, Defendant Chris Flores admitted that he, "individually and aiding and abetting Kenneth Flores," gave, offered, and promised things of value to Kelly and Mathes "for or because of" official acts they took on behalf of companies owned or controlled by the Flores family. *ECF No. 27-1* at 10. He further admitted those official acts included "providing [] confidential government information and source selection information to [Kenneth] Flores and making recommendations favorable to HHI and AES with respect to the TAMC contract and the MAMC [Contract]." *Id.* at 10–11. Chris Flores also admitted the payments made to Kelly and Mathes "originated with HHI and AES but were funneled . . . through Alliance Supply," a separate company he owned. *Id.* at 11. From November 15, 2018, until June 25, 2020, Alliance paid Mathes' com-

11

pany C & S Consulting $216,710.46. *Id*. at 11. From February 21, 2019, until July 17, 2020, Alliance paid Kelly's company Waysepappy Consulting $57,096.50. *Id*. at 11.

Plaintiff has identified forty-six (46) Alliance Supply invoices submitted by Defendant Chris Flores to HHI and AES under the MAMC and TAMC Contracts, totaling $215,218.27. *ECF No. 27-1* at 22–87. Those invoices did not disclose gratuity payments, consulting fees, or any other transfer to Kelly or Mathes. Instead, the invoices listed cleaning products such as disinfectant, washroom cleaner, neutral cleaner, degreaser, floor finish, carpet shampoo, and foam soap. *Id*. According to the Declaration of Special Agent Sean de Haas, the United States' investigation of Defendant Chris Flores and his family did not lead to any evidence that Alliance Supply, C & S Consulting, or Waysepappy Consulting provided the cleaning supplies indicated in their invoices to HHI or AES. *ECF No. 39-1* at 4.

Defendant Chris Flores neither attaches nor identifies any competent summary judgment evidence creating a genuine dispute on this element. *See*, *generally*, *ECF No. 35*. As indicated above, his Response focuses principally on damages. *Id*. at 1–5. Although Defendant Chris Flores suggests, without pointing to any evidence in the record, some invoices may be duplicative or that certain email communications are susceptible to competing interpretations, those arguments do not answer the central problem: the invoices on their face purported to bill for one thing (here cleaning supplies) while the undisputed record shows the invoiced funds were used to pay for another thing (gratuity payments to Kelly and Mathes). Defendant Chris Flores points to no purchase orders, delivery receipts, inventory records, or other evidence showing that the forty-six (46) invoices accurately reflected goods actually supplied under the contracts. Nor does he explain how an invoice from Alliance Supply to AES with a notation "to pay Kar[isa]," apparently

included by accident, can be reconciled with an ordinary sale of cleaning products. *ECF No. 27-1* at 70.

Accordingly, the Court concludes that the record is undisputed and Plaintiff has established the first element of its FCA cause of action by showing a false or fraudulent course of conduct as a matter of law.[8]

### b.    Scienter

The FCA's scienter element requires proof that the defendant acted knowingly, that is, with actual knowledge of the information, deliberate ignorance of its truth or falsity, or reckless disregard of its truth or falsity. 31 U.S.C. § 3729(b)(1). Plaintiff is not required to prove specific intent to defraud. *Id.* The inquiry turns on the defendant's subjective belief at the time the claims were submitted. *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 749–51 (2023). The operative question then is not whether Defendant Chris Flores can posit an innocent explanation for the invoices, but whether there is a genuine issue of material fact as to his knowledge the invoices were false. The Court concludes there is not.

Here, it is undisputed Defendant Chris Flores had firsthand knowledge of the payment stream the invoices concealed. Again, in his Written Plea Agreement, Flores admitted that he, individually and while aiding and abetting Kenneth Flores, gave, offered, and promised things of value to Kelly and Mathes in exchange for Mathes and Kelly taking official acts regarding the MAMC Contract and the TAMC Contract. *ECF No*. 27 at 5; *ECF No. 27-1* at 1–18. He further admitted that, because of those official acts, payments were made to Kelly and Mathes after they left government employment; that those payments were made to Waysepappy Consulting and C & S Consulting, (*ECF No. 27* at 6*; ECF No. 27-1 at* 11), and that the source of those payments

---

[8] Because factual falsity is sufficient to resolve this element, the Court does not discuss or determine whether the same invoices were also legally false by virtue of the underlying gratuity violations.

originated with HHI and AES but was funneled through Alliance Supply. (*ECF No. 27* at 6*; ECF No. 27-1 at* 11). Defendant Chris Flores also admitted that Alliance Supply paid Mathes's company $216,710.46 and Kelly's company $57,096.50 during the relevant period. *ECF No. 27* at 6*; ECF No. 27-1 at* 11. Those admissions alone leave no room for any suggestion that Defendant Chris Flores was unaware of the true purpose of the Alliance Supply invoices.

Additionally, however, Plaintiff identifies contemporaneous documents, emails, and text messages that reinforce the Court's conclusion. *ECF No. 39-4, 39-5, 39-6, 39-7, 39-8, 39-9, 39-10, 39-11, 39-12, 39-13, 39-14, 39-15, 39-16, 39-17.* These documents are in part comprised of the invoices themselves, which include an August 20, 2019, invoice from Alliance Supply to AES bearing the notation, "This invoiced in Aug to pay Kar[isa], will do monthly now." *ECF No. 27-1* at 9, 22–68, 70–87. Any reasonable reading of these documents cannot suggest the actions taken by Defendant Chris Flores were a result of his negligence or mistake. Instead, the Court finds the summary judgment record shows Defendant Chris Flores knew the invoices were falsely used as vehicles to route payments from Plaintiff to Kelly and Mathes while disguising those payments as routine supply purchases. Again, the Court notes that Defendant Chris Flores' Response does not oppose, or even address, this element.[9]

To the extent that, upon a liberal construction, Defendant Chris Flores' Response contains a challenge to a November 10, 2018, email conversation, the Court briefly addresses it. *ECF No. 35 at 3*. In his Response, Defendant Chris Flores argues "email communications referenced by [the] Government (e.g., regarding adding profit to cover taxes) are susceptible to competing interpretations—they show invoicing practices designed to ensure taxable income, not necessarily concealment of illicit gratuities." *Id*. Because the Court finds this argument conclusory and vague, the Court will only mention that, per the Fifth Circuit, a nonmovant's (such as De-

---

[9] *See supra* discussion (1).

fendant Chris Flores') burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Chris Flores presents no evidence of contradictory facts challenging Special Agent de Haas's interpretation—via his investigation—of the November 10, 2018, email; Chris Flores's own plea admissions; the sham consulting invoices submitted to Alliance Supply by Mathes and Kelly; the forty-six (46) invoices falsely listing cleaning supplies; and the August 20, 2019, invoice expressly stating it was "to pay Kar." To repeat, Defendant Chris Flores identifies no competent evidence such as purchase orders, delivery receipts, inventory records, showing that he believed the invoices truthfully described cleaning supplies. Nor does he point to any evidence that he lacked knowledge of the payments to Kelly and Mathes. At most, upon a liberal construction, he offers an unsupported, conclusory, and speculative argument to the Court.

Accordingly, the summary judgment record establishes Defendant Chris Flores knew that money from HHI and AES was being routed through Alliance Supply to Kelly and Mathes due to the false invoices he submitted that describe charges for cleaning supplies. The Court concludes Plaintiff has established scienter, the second element of its FCA claim, as a matter of law.

### c.    Materiality

For a false claim to violate the FCA, it must be material. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 191 (2016). The FCA defines materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). Materiality "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar,* 579 U.S. at 193. In making that

assessment, courts in the Fifth Circuit have considered, among other things, whether the defendant violated an express condition of payment, Plaintiff's conduct after learning of noncompliance or misconduct, and whether the violation is minor or insubstantial. *See U.S. ex rel. Lemon v. Nurses To Go, Inc.,* 924 F.3d 155, 160 (5th Cir. 2019); *Escobar*, 579 U.S. at 193–95.

The relevant question for the Court to consider is whether the summary judgment record establishes "[Defendant Chris Flores's] false statements could have influenced the [G]overnment's pay decision or had the potential to influence the [G]overnment's decision, not that the false statements actually did so." *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017). The Court concludes that Plaintiff has satisfied that standard.

The summary judgment record demonstrates Defendant Chris Flores submitted forty-six (46) false invoices, representing to Plaintiff that Alliance Supply was billing HHI and AES for cleaning products when it was actually routing unlawful gratuity payments to Kelly and Mathes. This is not a case where the facts involve a peripheral regulatory defect or a technical misstep in contract administration. Instead, the falsity concerns the very thing for which payment was requested: the invoices purported to bill for cleaning supplies, while the evidence shows the invoiced funds were actually used to make gratuity payments to former federal employees. There is obvious importance to that distinction in deciding whether to pay the claim. *See Escobar*, 579 U.S. at 193; *United States ex rel. Hueseman v. Pro. Compounding Ctrs. of Am., Inc.*, 664 F. Supp. 3d 722, 747–48 (W.D. Tex. 2023) (recognizing that a factual component of a claim can be inherently material under the statute). Thus, materiality is readily apparent from the summary judgment record.

In his Response, Defendant Chris Flores argues Plaintiff has not shown HHI or AES would have refused payment had the invoices disclosed payments to consultants rather than

16

cleaning supplies. *ECF No. 35* at 2. This argument, however, demands more than the FCA requires. Plaintiff is not required to prove actual reliance or an actual contemporaneous refusal to pay; it is only required to show that the false description could have influenced the payment decision or had the potential to do so. *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 470 (5th Cir. 2009); *Harman*, 872 F.3d at 661. The invoices specifically represented that Alliance Supply was billing for goods or services provided under the contracts, but the record shows those representations were false and instead concealed the invoices' true purpose: funding gratuity payments. Because that misrepresentation concerned the very nature of what Plaintiff was being asked to pay for, it was inherently material to the payment decision. Plaintiff does not fund federal contracts so that contractors may divert funds designated for one purpose to a wholly different and unauthorized end.[10]

Accordingly, the Court concludes that the false descriptions in the forty-six (46) Alliance Supply invoices were material as a matter of law. The invoices did not merely omit collateral information; they misrepresented the very nature of what Alliance Supply was billing for. Because those misrepresentations plainly had the capacity to influence the payment decision, the materiality element is satisfied.

### d.    Causation

The fourth and final element of FCA liability requires only that the knowing, material falsehood "involved a claim" submitted to Plaintiff, and that Plaintiff paid it. *United States ex rel. Gomez v. Koman Construction, LLC.,* 796 F.Supp.3d 353, 376 (5th Cir. 2023) (quoting *Abbott v. BP Expl. & Prod., Inc.,* 851 F.3d 384, 387 (5th Cir. 2017)). As the Fifth Circuit recently explained, the FCA's causation standard "merely demands *more than mere passive acquies-*

---

[10] The Court notes Defendant Chris Flores identifies no competent summary judgment evidence that the invoices were immaterial, minor, or insubstantial.

17

*cence* in the presentation of the claim and *some sort of affirmative act* that causes or assists the presentation of a false claim." *United States ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*, No. SA-14-CV-00212, 2024 WL 2244818, at *5 (W.D. Tex. May 1, 2024) (quoting *United States ex rel. Aldridge v. Corp. Mgmt., Inc.*, 78 F.4th 727 (5th Cir. 2023) (cleaned up) (emphasis added)).

Here, although the United States did not pay Alliance Supply directly, the summary judgment record shows that the Alliance Supply invoices were paid using the government's funds. Defendant Chris Flores sent Alliance Supply invoices to HHI and AES in connection with the MAMC and TAMC contracts. *ECF No. 27-1* at 22–87. Those contracts included a requirement for HHI and AES to provide "cleaning supplies" and to "submit a written supply usage report . . . each year." *ECF No. 39-2*, MAMC Contract, Performance Work Statement (PWS), at ¶ 4.1.2 (p. 100); see also id. ¶ 5.1 (p. 104) (requiring contractor to "furnish all … supplies and services necessary to provide cleaning services for all facilities"); *ECF No. 39-3*, TAMC Contract, PWS ¶¶ 4.1.2, 5.1 (pp. 94–95 and 98) (same). HHI and AES sought reimbursement from the United States under the MAMC and TAMC contracts for providing "housekeeping and related services," and received federal funds as a result. *See ECF No. 39-4; ECF Nos. 39-5, 39-6, 39-7*. HHI and AES then used a portion of the money received from the Government to pay the false invoices submitted by Alliance Supply, which in turn remitted the illegal gratuity payments to Mathes and Kelly. *See ECF No. 39-8, 39-9, 39-10*.

In his Response, Defendant Chris Flores fails to create a genuine dispute on this element. He argues, in a conclusory manner, a "[m]aterial fact dispute exists as to whether Plaintiff actually paid the invoiced amounts, whether the payments were diverted, and whether any payment caused loss to the United States as required under 31 U.S.C. § 3729(a)(1)(A)." *ECF No. 35* at 1.

18

Those arguments seem to confuse the difference between disputing the facts establishing liability, with a challenge to the appropriate measure of damages. The relevant question here is whether the summary judgment record connects the disbursement of funds by Plaintiff to the false claims, and the Court concludes that it does.

This case does not rest solely on implication alone, Plaintiff has identified specific invoices, specific payors, specific payees, and a specific scheme by which Plaintiff funded contract payments were converted into gratuity payments. *ECF No. 39-4, 39-5, 39-6, 39-7, 39-8, 39-9, 39-10, 39-11, 39-12, 39-13, 39-14, 39-15, 39-16, 39-17*. As a result, the Court concludes that the forty-six (46) Alliance Supply invoices caused Plaintiff to pay out money. Accordingly, the fourth element is established as a matter of law.

In sum, because the summary judgment record establishes the four elements: falsity, scienter, materiality, and causation, and because Defendant Chris Flores did not create a genuine issue of material fact as to those elements or dispute those elements in his Response, the Court concludes that Plaintiff has established liability under 31 U.S.C. § 3729(a)(1)(A) as a matter of law. ECF No. 27. The Court next addresses Plaintiff's relief.

### B.    Plaintiff's Relief

Regarding Plaintiff's relief, the Court will order the parties to submit supplemental briefing on the issue of common damages and whether Defendant Chris Flores is entitled to any potential offset or credit regarding (1) the $3,700,000 restitution in the criminal case or (2) the Settlement Agreement in this case wherein Defendants AES, Kenneth Flores, and Irma Flores agreed to pay $2,000,000 to Plaintiff and were subsequently terminated from this case. *See ECF Nos. 25, 26, ECF No. 27-1* at 16–17.

19

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment, (*ECF No. 27*), is

**GRANTED IN PART AS TO LIABILITY AND DENIED IN PART AS TO DAMAGES.**

It is so ORDERED.
SIGNED this 28th day of April, 2026.

JASON  PULLIAM
UNITED STATES DISTRICT JUDGE